UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JOSEPH GANT,

               Petitioner,

    v.

SUPT. MARK MILLER,

               Respondent.

_____

**DECISION AND ORDER**

No. 6:21-cv-06731 CJS

**APPEARANCES**

For Petitioner:               Joseph Gant, *Pro Se*
                                    Green Haven Correctional Facility
                                    Box 4000
                                    Stormville, NY 12582-0010

For Respondent:              Michael J. Hillery, Esq.
                                    Erie County District Attorney's Office
                                    25 Delaware Avenue
                                    Buffalo, NY 14202

**INTRODUCTION**

*Pro se* petitioner Joseph Gant ("Gant") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  ECF No. 1.  Gant challenges the constitutionality of the judgment entered against him on June 25, 2015, in New York State, Erie County Court (D'Amico, J.), following a jury verdict convicting him of second-degree (intentional) murder (New York Penal Law ("P.L.") § 125.25(1)); three counts of attempted second-degree (intentional) murder (P.L. §§ 110.00, 125.25(1)); and second-degree criminal possession

of a weapon (P.L. § 265.03(3)).[1]  Gant is currently serving his sentence on this judgment.[2]
For the reasons below, the request for a writ of habeas corpus is denied, and the petition
is dismissed.

## BACKGROUND

**I.     Pre-Trial Proceedings**

**A.     The Crime and Indictment**

Gant's conviction arises from an incident that occurred on August 12, 2014, in the
City of Buffalo  At about 3:30 p.m., a large group of people had gathered to watch two
girls fighting at the Langfield Projects near the pedestrian footbridge that goes over the
Kensington Expressway.  The shooter, a black male who was wearing a hat and a dark-
colored, striped Adidas jacket, was part of the crowd and was filming the fight with his cell
phone.  Some other men tried to stop him from recording the fight, and a fist-fight ensued.
At some point, the man in the Adidas jacket pulled out a gun and fired into a group of
unarmed people who were attempting to flee across the footbridge.  Fourteen-year-old
Raymond Patterson, III, was shot in the back and died from his injuries.  Thirteen-year-
old Dae'Mone Patterson, sixteen-year-old Austin Neal, and thirteen-year-old Ned Rainey,
Jr., suffered serious but non-fatal injuries.  Based on an eyewitness' identification of Gant
after viewing some civilian-provided cell phone footage and a subsequent photo array,
the police arrested Gant on August 13, 2014, for the shootings.

---

[1]     Page citations to Gant's and Respondent's pleadings are to the pagination
automatically generated by the Court's case management and electronic filing system
(CM/ECF) and located in the header of each page.

[2]     *See* https://nysdoccslookup.doccs.ny.gov/ (results for DIN 15B2553 (last
accessed Oct. 27, 2024)).

### B.    Indictment

On August 25, 2014, an Erie County grand jury returned indictment 01455-2014 against Gant.  For the death of Raymond Patterson, III, Gant was charged with intentional murder under P.L. § 125.25(1) (count one) and depraved indifference murder under P.L. § 125.25(2) (count five).  Counts two, three, and four charged Gant with attempted second-degree (intentional) murder (P.L. §§ 110.00, 125.25(1)) as to Dae'Mone Patterson; Ned Rainey, Jr.; and Austin Neal.  Counts six, seven, and eight charged Gant with three counts of second-degree assault (P.L. § 120.05(4)(a)) as to the foregoing three victims.  Count nine charged Gant with second-degree criminal possession of a weapon (P.L. § 265.03(3)).

### C.    Suppression Hearing

Erie County Court Judge Michael L. D'Amico ("trial court") held a suppression hearing on April 15 and 17, 2015.  Salvatore Valvo ("Valvo") testified that in August 2014, he was employed as a detective with the Buffalo Police Department ("BPD").  H.13-14.[3] At some point early in the day on August 13, 2014, Valvo received a cell phone video of the fight that preceded the shooting; there was some audio of the shooting, but it was not depicted on the video.  H.15, 16.  Also on that day, Valvo spoke with an individual identified at the hearing only as "Witness A" and showed her the video.  H.5.

Before showing Witness A the video, Valvo asked her to let him if know if she recognized anyone in the video and, if so, where from and how.  H.15.  At a "very early" point in the video, H.33, Witness A told Valvo that she recognized "the person who was

---

[3]    Citations to "H." refer to the original pagination of the suppression hearing transcript, filed as part of Respondent's Exhibit A.  Citations to "T." refer to the original pagination of the trial transcripts, also filed as part of Respondent's Exhibit A.

involved in the shooting or [who] did the shooting," H.16. Witness A did not identify the individual by name but said "[t]hat's the shooter." H.34. Valvo excerpted from the video a still photograph of the person selected by Witness A. H.16-17. Valvo showed the still photograph to Witness A afterwards and confirmed that it was the same person she had identified in the video. H.35. In the video and the still photograph, the man selected by Witness A is wearing a hat, dark-colored Adidas jacket with white stripes, and glasses. H.17-18; *see also* People's Hearing Exhibit 2.

About 24 hours later, Witness A viewed a six-pack photographic array containing Gant's picture. However, Valvo did not construct the array or participate in the procedure. H.36. Following the conclusion of the photographic array, Valvo learned that the person identified by Witness A was Gant. H.17, 35-36.

At about 10 p.m. on August 13, 2014, Gant was brought to the BPD homicide office at 74 Franklin Street. H.19-20. Valvo testified that Gant's handcuffs were removed after he was brought into the interview room. H.21. Valvo introduced himself and read the *Miranda* warnings from a preprinted card to Gant, who acknowledged that he understood his rights. H.21-22, 24. He signed the card and agreed to speak with Valvo and BPD Detective Scott Malec ("Malec"). H.21, 34-25. The interview was recorded on video, and a copy was introduced at the suppression hearing. H.19-20.

Malec offered Gant beverages and cigarettes, and Gant was allowed to smoke during the interview. H.21, 27. Valvo recalled that Gant's voice was "very quiet" to the point it "was difficult to understand or hear" him. H.25, 37-38. Gant's affect seemed odd to Valvo, prompting him to ask whether Gant had been drinking. Valvo did not detect the smell of alcohol on Gant, however. H.38. Gant admitted that he had consumed some

alcohol prior to the interview but said that he was not drunk and that he understood the detectives' questions.  H.27, 38.  Valvo said that Gant never asked for an attorney and did not indicate in any way that he no longer wanted to speak with him and Malec or wanted to leave.  H.28.

Valvo testified that at about 1:25 a.m., a BPD detective knocked on the door and entered the interview room.  H.29.  Upon speaking with this detective outside the interview room, Valvo and Malec learned that trial counsel was at the homicide office to see Gant.  H.29.  Valvo said that at about 1:31 a.m., trial counsel was permitted to speak with Gant privately; during their meeting, the video recorder was turned off.  H.29.

Later in the morning, Valvo learned that the unattended voicemail at the homicide office had recorded two messages from trial counsel at 12:49 a.m. and 12:51 a.m. on the morning of August 14, 2014.  H.30.  Trial counsel did not refer to Gant by name but said that he "did not want anyone speaking to his client."  H.30.[4]

At the continuation of the hearing on April 17, 2015, BPD Detective Patricia Wrest ("Wrest") testified that at 1:14 a.m. on August 14, 2014, she showed a photographic array to Witness A.  H.49.  Wrest did not prepare the array and had no information about why the various subjects were chosen.  H.51, 59.  At the time, Wrest did not know who, if anyone, was suspected of being the shooter.  H.51.  Nor did she know the subjects' identities or whether any of them were suspected of being involved in the shooting.  H.51-52, 55-56.  The photographic array (People's Hearing Exhibit 1) depicted six black males

---

[4]    Subsequently, the prosecution learned that trial counsel had first contacted the BPD homicide office at approximately 12:18 a.m. but was unable to leave a voicemail message.  The prosecution agreed not to introduce any statements Petitioner made after 12:18 a.m. on August 14, 2014, as part of its case-in-chief. Thus, the only statements the prosecution sought to use were those made by Petitioner from 10:22 p.m. on August 13, 2014, to 12:18 a.m. on August 14, 2014.

facing forward.  H.51.  None of the subjects was wearing a hat, jacket, or glasses.  H.56-57.

After reading the standard viewing instructions to Witness A, Wrest handed her the array in a manila folder.  H.53, 61.  Witness A opened the envelope and said she recognized the person in the photograph located in position number three of the array, explaining that he was the "shooter at the scene."  H.53-54.  Gant's photograph was in position number three.  H.53, 56.

On June 10, 2015, the trial court issued a decision and order denying suppression of Gant's statements and Witness A's identification following the photographic array.  *See* Resp't Ex. A.

## II.    Trial

### A.    Prosecution's Case

#### 1.    The Eyewitnesses

The prosecution called several eyewitnesses, including Carmelita Scott, who positively identified Gant as the shooter; Jazlyn Kearney, Gant's then-girlfriend, who said that she did not see anyone with a gun; Dallas Smith, Omar Clark, and Jevon Rozier-Sharpe, who all identified the shooter based on the clothing he wore; and the three boys who were shot (Dae'Mone Patterson, Austin Neal, and Ned Rainey, Jr.).

#### *Carmelita Scott*

On August 12, 2014, Carmelita Scott ("Scott") was living on Oakmont Avenue with her two daughters and her son.  T.693.  That afternoon, she became aware of an incident involving her then eleven-year-old son.  T.693.  As a result, Scott and her then fifteen-year-old daughter, Javonti, walked over the pedestrian footbridge near the Kensington

Expressway to Roosevelt Park.  T.694-95.  They were at the park briefly, where Scott saw a bunch of kids near the basketball courts.  T.695.

Scott and her daughter then returned home.  T.695-96.  Javonti walked over to the house of one of their neighbors, Jazlyn Kearney ("Kearney"), a/k/a, "Poonie," and spoke with her briefly.  T.696.  Gant, who was Kearney's boyfriend at the time, also was at Kearney's apartment.  T.696-97.  Scott did not know Gant's name but had seen him walking in and out of Kearney's house on two or three occasions.  T.724.  Scott identified Gant in the courtroom.  T.696-97

Scott, along with Javonti, Kearney, and Gant, walked back towards Roosevelt Park.  T.697.  Before they got there, they encountered the mother of the child that Scott's daughter, Javonti, "had a problem with."  T.698.  As the child's mother confronted Javonti, a girl named "NuNu" approached them; then Javonti and NuNu started fighting right in front of the footbridge.  T.699, 705.  Scott said that "[l]ots" of people came over and gathered around Javonti and NuNu.  T.699.

At some point, "a male fight" broke out and a "whole bunch" of males were throwing punches at each other.  T.700, 743.  Then Scott started hearing gunshots.  T.700.  She saw Gant, wearing a black and white Adidas jacket, shooting towards some people who were running across the pedestrian footbridge.  T.700-01, 714, 745.  Scott did not see Gant pull the gun out, but she did see him pulling the trigger.  T.745, 765.  Scott did not see anyone else with a gun.  T.700-01.  Scott got her daughter and left, so she did not see what happened after the shooting stopped.  T.701-02.

On August 13, 2014, Scott gave a statement to the police and viewed a cell phone video of the fight, as a well as a still photograph from the video.  T.702, 716.  At trial, Scott identified Gant in the video and in several still photographs from that video.  T.706-07.

### Jazlyn Kearney

Kearney testified that her nickname was "Poonie," and that Gant was her boyfriend at the time.  Gant's nickname was "Junior."  T.803-04.  On the afternoon of August 12, 2014, Kearney was at her house on Oakmont Avenue with Gant.  T.805.  Javonti and Scott came over to Kearney's house at about 3 p.m. or 3:30 p.m.  Kearney and Gant walked over to the footbridge with Scott and Javonti.  T.807.  Javonti started fighting with another girl who Kearney did not know.  T.808.  Gant was recording the fight on his cell phone; other people had their cell phones out also.  T.808.  There were "a lot" of people watching the two girls fight.  T.809.

Kearney said that someone "snatched Junior's phone" and asked why he was recording the fight.  T.809.  Kearney did not know who took Gant's phone and could not describe what he was wearing; she only could say he "looked older" and was "[t]all."  T.810.  Gant and the person who took his phone "were having words."  T.811.  That person "swung at Junior first."  T.811.  Gant hit back.  T.811.  Kearney saw "people start running from the viaduct and start jumping [Gant]" and "piling on" him.  T.809.  Kearney did not know any of Gant's assailants and could not estimate any of their ages.  T.811.

When Kearney heard gunshots, she ran.  T.811, 812.  Kearney did not see who was shooting and did not see anyone with a gun.  T.812, 814.  She heard "about seven" shots but could not tell from which direction they were coming.  T.813.  She did not see anyone get injured.  T.815.

Afterwards, Kearney went to her sister's house on Hempstead Street.  T.814. Later that day, she saw Gant, who had shaved his hair into a "Mohawk" style and changed into different clothes.  T.816.

### Dallas Smith

Dallas Smith ("Smith") testified he was living on Oakmont Avenue on August 12, 2014; the footbridge that goes over the Kensington Expressway to Roosevelt Park was across from his house.  T.893, 895.  From his house, he could see the end of the footbridge pretty well.  T.896.  At about 3:40 p.m., he was in his kitchen playing cards with his family when he heard "a lot of noise going on outside."  T.894.  Smith went out to his back porch where he saw two girls fighting; as he watched, more and more people gathered around to watch them.  T.894, 897.  Smith then saw "a group of guys run over the bridge," and "a couple seconds later another fight broke out with the fellows."  T.897. He could not identify anyone or tell how old they were; he just saw "a whole bunch of fists being thrown."  T.898.

All of a sudden, "everybody started running over the bridge towards the park," which was also towards Smith's house.  T.898.  Then Smith heard gunshots.  T.898. Smith could see the shooter, who was wearing a black jacket with white stripes; he was standing at the foot of the bridge and was shooting towards the park.  T.898-99, 947. Smith did not see anyone else with a gun.  T.899-900.  Smith could not see anything physically preventing the shooter from running to his left, right, or in the opposite direction. T.900-01.

After he "let off a lot of shots," the shooter ran away toward Edison Street.  T.902-03.  Smith called 911 and went to check on the boy on the bridge who had been shot.  T.903.

Later that afternoon, Smith gave a statement to the police.  That evening, Smith returned to the police station where he viewed a cell phone video of the fight between the girls that preceded the shooting as well as a still photograph from the video depicting Gant—who Smith did not know.  T.906, 909.  Smith identified the person in the video and photograph as "the dude . . . [t]hat shot at the bridge."  T.906-07.

### *Omar Clark*

Omar Clark ("Clark") was at his daughter's house on Oakmont Avenue babysitting his grandson on August 12, 2014.  T.971.  At about 3:30 p.m., Clark heard "a ruckus," looked out the back door, and saw some girls fighting on the sidewalk near the footbridge.  T.971-73.  Another fight in the same area started between some young men in their early to mid-twenties.  T.975-76.

Clark saw a man wearing a dark-colored Adidas jacket running towards Clark's daughter's house on Oakmont.  T.976.  Some of the people who were fighting had dispersed.  T.976, 978-79.  Clark could not see who they were fighting or whether they had jumped on one individual; it was just "a burst of people fighting."  T.986-87.  When the man in the Adidas jacket stopped at the footbridge and turned back around, Clark saw him pull a gun out of his pants' pocket.  T.976-77, 989-90.  Then the man started firing towards the footbridge.  T.977, 980.  Clark could not see anything preventing the man from continuing to run in the direction he had been heading, or from going to the right or

left.  T.977-78.  After firing about five or six shots, the man stopped shooting and ran in the direction of Edison Street.  T.980-81.  Clark did not see anyone else with a gun.  T.980.

Later that evening, Clark went to the police station and viewed a cell phone video of the fight that preceded the shooting.  T.982.  Clark pointed out the man in the video wearing a black Adidas jacket with stripes and told police that he was the shooter.  T.982-83.

### *Jevon Rozier-Sharpe*

Jevon Rozier-Sharpe ("Rozier-Sharpe") testified that on August 12, 2014, at about 3:15 p.m., he was playing basketball at Roosevelt Park.  T.1328-29.  Somebody ran across the pedestrian footbridge and said that two girls were fighting at the Langfield Projects.  T.1330-31.

Rozier-Sharpe and a few of his companions crossed the footbridge and saw a huge circle of people watching two girls fighting.  T.1332-33.  Among the crowd that had gathered were two males who were "exchanging words with each other."  T.1334.  One was wearing a Chicago Bulls jersey and the other was wearing a cap and a black and white Adidas jacket.  T.1334.  Rozier-Sharpe had seen the man in the Bulls jersey at the basketball courts in the past; his nickname was "E."  T.1335.  However, he had never seen the man in the Adidas jacket.  T.1335.  Rozier-Sharpe heard the man in the Adidas jacket say, "Don't jump in or you'll die."  T.1335-36.  Then the man in the Adidas jacket threw a punch at the man in the Bulls jersey, and they started fighting.  T.1336.  About six other men people jumped the man in the Adidas jacket.  T.1336.  During that fight, Rozier-Sharpe did not see anyone with a gun, knife, or any other type of weapon.  T.1336-37.

Rozier-Sharpe said that the man in the Adidas jacket "got out [of] the crowd, backed [up] a couple feet, and that's when he pulled out a pistol" "[f]rom his waistband." T.1337-38.  The man started "chas[ing] a crowd that was running over the bridge" even though there was nothing blocking the man from going in a different direction.  T.1337-38.  Rozier-Sharpe, who also headed towards the bridge and was fairly close to the man, saw him fire about six shots "[s]traight all across the bridge" in the direction of the playground T.1339, 1340.  Rozier-Sharpe did not see anyone else with a gun.  T.1339-40.  At the time the man was shooting, there was no one attacking him or otherwise preventing him from heading in a different direction.  T.1340.

### Dae'Mone Patterson

Dae'Mone Patterson ("Dae'Mone") was thirteen years-old on August 12, 2014. T.767.  At that time, he was living on Millicent Avenue with his mother, cousin, and now-deceased brother Raymond.  T.768.  On the afternoon of August 12, 2014, he was playing basketball at Roosevelt Park with Raymond; his cousin, "ManMan"; his friend, Austin Neal; and some other friends.  T.770-71, 792.  All of a sudden, Raymond "panicked and . . . ran towards the [foot]bridge."  T.771.  Dae'Mone chased after him.  T.771.  Raymond was about three-fourths of the way across the footbridge when he got shot.  T.772-73. Dae'Mone heard shots but could not tell where they were coming from or who was shooting.  T.773, 774.

Dae'Mone crouched down next to Raymond, who said to go get their mother. T.773.  Dae'Mone ran back over towards the basketball courts and headed home.  T.773. As he was running, one of Dae'Mone's neighbors told him that he had been shot.  T.776. Dae'Mone looked down and noticed that he was bleeding from his left ankle area.  T.776.

Dae'Mone was treated at the hospital for a through-and-through gunshot wound, and his leg was in a cast for a month and a half.  T.777.

Dae'Mone testified that neither he nor anyone in their group had a gun or had gotten into a fight with anyone that day.  T.774-75.

*Austin Neal*

Austin Neal ("Austin") was sixteen years-old on August 12, 2014.  T.842.  That afternoon he was playing basketball at Roosevelt Park with his cousin, Davonti; his friend, Ned, a/k/a, "ManMan".   Raymond and Dae'Mone also were there, although Austin claimed he did not know their names, describing them only as the brothers who had gotten shot.  T.843-45.  Austin "hear[d] a lot of noise" and ran over the footbridge toward the Langfield Apartments.  T.846.  He was with Davonti and Ned; he did not know where Raymond and Dae'Mone were at that point.  T.846-47.  When he got to the other side of the bridge, he saw some females fighting.  T.848.  He claimed he did not stay to watch because his mother, who was present, told him to go back over the bridge toward the basketball courts.  T.848.

As Austin headed back over the bridge, he heard "a lot of people hollering" and someone said, "oh, he about to shoot."  T.849.  When Austin heard that, he ran.  T.850.  As he was running, he heard gunshots coming from the Langfield Projects side but could not remember how many.  T.850, 851.  Austin looked down at his foot and saw blood.  T.850, 852.  Some bystanders took him to the hospital where the through-and-through wound on his foot was cleaned and x-rayed.  T.853.  Apart from pain medication, he required no other treatment.  T.853, 855.

_Ned Rainey, Jr._

Ned Rainey, Jr. ("Ned") was thirteen years-old on August 12, 2014.  T.1058.  At about 3:30 p.m. that day, he was playing basketball at Roosevelt Park with Austin, Davonti, Raymond, and Dae'Mone.  T.1059-60.  While Ned and his friends were playing, they noticed people started walking toward the footbridge, so they all followed them to see what was happening.  T.1060-61.  Ned saw people fighting on the Oakmont Avenue side of the bridge but could not recognize anyone.  T.1062.  Ned testified that neither he nor any of this friends had a gun or got involved in a fight that day.  T.1062, 1065.

Ned then saw a man in a red and black Chicago Bulls jersey, who he had seen earlier playing basketball at Roosevelt Park, start running toward the park.  T.1063-64. Ned turned and started running in that direction as well.  T.1063, 1066.  He then heard shots coming from the Oakmont Avenue side but did not see the shooter or see anyone with a gun.  T.1064-65.

After he had crossed the bridge and was still running, Ned noticed that a bullet had grazed his right arm.  T.1067.  He was taken to the hospital where he received twelve to fourteen stitches to close the gunshot wound.  T.1068.

### 2.    The Police Investigation

Former BPD Detective Valvo testified that he obtained some cell phone video footage from a citizen on August 12, 2014, and showed it to various individuals to see if they recognized anyone.  T.1169-70; _see also_ People's Trial Exhibit 1 (cell phone video); People's Trial Exhibit 2 (video in still-frame photos).

On the night of August 13, 2014, Gant was brought down to the BPD homicide office.  T.1172.  After being read his rights and waiving them, Gant underwent a

videorecorded interview with Valvo and Malec.  T.1172, 1174-75.  The interview was played for the jury.  T.1177-80; *see also* People's Trial Exhibit 3.  Although they did not believe it to be true, Valvo and Malec suggested to Gant that he might have been defending himself during the incident.  T.1177, 1182-83.  Though it was very difficult to hear Gant during the interview, T.1176, 1184, he consistently denied being the person the still photograph extracted from the cell phone video provided by the citizen to Valvo on August 12, 2014.  T.1183.  Gant also denied being at the fight, recording the fight, or doing the shooting.  T.1184.  .

Gant gave Valvo permission to search the SIM card from his cell phone, but nothing related to the incident was found on it.  T.1181.  Valvo said that they never located the video of the girl fight they believed Gant had been recording with his phone prior to the shooting.  T.1182.  Ten spent cartridges from a .45-caliber pistol were recovered from the crime scene where the shooter was alleged to have been standing.  T.1037-49. However, the police never located the gun used in the shooting.  T.1233.

### 3.    Forensic Medical Evidence

Katherine Maloney, M.D., of the Erie County Medical Examiner's Office, performed the autopsy on Raymond on August 13, 2014.  T.1189, 1193.  At the time of death, Raymond was five feet, five and one-half inches tall and weighed 113 pounds.  T.1196. Dr. Maloney found three gunshot wounds on the body.  T.1200.  One bullet entered the right side of the back and exited the right side of the chest, perforating the right lung and causing substantial internal bleeding.  T.1202, 1206-08.  Another bullet passed through the left wrist, fracturing it.  T.1211-12.  The third bullet entered the back of the left thigh and did not exit.  T.1216, 1218.  There were no indications of stippling or fouling, leading

Dr. Maloney to conclude that they were not inflicted at close range, i.e., at a distance of two and one-half feet or less.  T.1202-03, 1211-12, 1217.  Dr. Malone concluded that the cause of death was the gunshot wound to the back.  T.1220-21.

### B.    The Charge Conference and Verdict

After the defense rested and the jury was excused, the trial court noted that there had been a brief charge conference earlier in chambers, and it was "pretty well understood" by the parties that the court intended to "charge in the alternative depraved and reckless on one side and intentional on the other side.  Either/or, but not both." T.1425.  The prosecutor and both defense attorneys confirmed their understanding of this point:

| | |
|---|---|
| MS. GABLE: | Correct.  Counts 1 through 4. |
| THE COURT: | Right.  The intention of crimes. |
| MS. GABLE: | Correct. |
| THE COURT: | And the depraved and reckless crimes in the alternative. |
| MS. GABLE: | Correct. |
| THE COURT: | You agree on that, true? |
| MR. DAVIS: | Yes, Your Honor. |
| MR. PENDERGRASS: | Yes. |

T.1425.

The following day, the trial court presented a proposed verdict sheet to the parties based on the previous discussion.  T.1441-42.  The prosecutor objected because, under her reading of the law, the jury "can't mix them [i.e., *mentes reae*] up."   T.1442.  The prosecutor said that:

> [i]f they find not guilty on intentional [murder of Raymond] under Count 1, then they should go right to Count 5[, depraved indifference murder of Raymond] and not even consider [Counts] 2, 3, and 4[, attempted second-degree (intentional) murder as to Dae'Mone, Ned, and Austin,] 'cause they can't find both, you know, intentional conduct -- no intentional conduct as to the murder victim and intentional conduct as to the other three.  That was what we were discussing yesterday.

- 16 -

T.1442.  In response to that explanation, the following colloquy ensued:

| | |
|---|---|
| THE COURT: | Oh, you're saying they shouldn't even consider intentional conduct for the attempted murders? |
| [PROSECUTOR]: | They can't because it's all the same intent. That's what the case said, you can't mix up *mens rea's* [sic] for victims. |
| THE COURT: | Okay.  So you want me to instruct them to first consider the intentional conduct, and if they find that he's not guilty of the intentional murder [under Count 1], skip right to [Count] 5? |
| [PROSECUTOR]: | Yes, I think that's what the law says we have to do. |
| THE COURT: | Everybody good with that? |
| [DEFENSE ATTY 1]: | Yes, Your Honor. |
| [DEFENSE ATTY 2]: | Yes. |
| [PROSECUTOR]: | And then if they find the intentional conduct, they don't consider [Counts] 5 through 8[, charging depraved indifference murder as to Raymond and reckless assault as to Dae'Mone, Austin, and Ned, respectively]; they go right to [Count] 9[, charging second-degree criminal possession of a weapon]. |
| THE COURT: | Right. |
| [PROSECUTOR]: | So they have to be done in blocks. |

T.1442-43.

After summations, the trial court revisited this issue again:

| | |
|---|---|
| THE COURT: | We did have a conference and I think this was on the record in chambers when we were talking about the verdict sheet and the charge, but everyone is pretty much on the same page here when we're talking either all intentional or all reckless or not guilty.  Those are our options. I'm just thinking the possibility of an inconsistent verdict, and in order to make sure that they don't give us any inconsistent verdicts, I am telling them that if they determine his conduct was not intentional for the murder count, that they are not to consider intentional conduct for the attempted murders. |
| [PROSECUTOR]: | That's correct, Judge. |
| THE COURT: | Even though there's separate victims. |

| [PROSECUTOR]: | Just for the record, the defendant of course is present for this as well, and that's what we had not only provided the Court and counsel at the beginning with the [*People v.* ]*Dubarry*[, 25 N.Y.3d 161 (2015)] case, but we also did some research in our office because *Dubarry* was one victim.  We did research on cases of multiple victims that under facts are very similar to this *Dubarry* overruling a case that said you could have under similar circumstances to this case.  Different *mens rea* for different victims.  It's got to be under these sorts of facts either all intentional or all reckless or nothing obviously. |
|---|---|
| THE COURT: | I think defense counsel agreed with that analysis. |
| [DEFENSE ATTY 2]: | Yes. |
| THE COURT: | The conduct for each of these alleged victims with respect to these alleged victims is either all intentional or all reckless. |
| [DEFENSE ATTY 1]: | Yes. |
| THE COURT: | Or he's not guilty.  There's obviously the third option. |
| [PROSECUTOR]: | And we had all discussed this prior to both counsels' summations. |

T.1527-28.  The jury was charged in conformity with the parties' discussions.  T.1543-44.

At the request of Gant's defense attorneys, the trial court agreed to charge the jury on two theories of the justification defense—use of deadly physical force in response to the use or imminent use deadly physical force, and use of deadly physical force in response to the commission of, or attempt to commit, robbery.  T.1428-31.

The jury returned a verdict find Gant guilty on the counts charging second-degree murder and attempted second-degree murder (Counts 1, 2, 3, and 4) and second-degree criminal possession of a weapon (Count 9).

### C.    Sentence

On June 25, 2015, Gant was sentenced to an indeterminate term of incarceration of 25 years to life on the second-degree murder conviction; determinate terms of ten years' incarceration plus five years' post-release supervision on the three attempted second-degree murder convictions; and a nine-year term of incarceration plus five years' post release supervision on the second-degree criminal possession of a weapon conviction.    The sentences on the attempted murder and weapons-possession convictions were ordered to run concurrently with each other but consecutively to the sentence for the murder conviction.

## III.    Post-Judgment Proceedings in State Court

### A.    Direct Appeal

Gant was assigned new counsel for his appeal.   Appellate counsel filed a brief arguing that: (1) Gant was unlawfully convicted of transferred intent attempted murder, a non-existent crime; (2) the trial court erroneously charged the jury in the alternative with regard to the counts involving an intentional mental state and those involving a reckless mental state; (3) the pretrial identification procedure was unduly suggestive because the police showed a "cell phone video, in which [Gant]'s image predominates" to Witness A the day before she viewed a photographic array and selected Gant as the shooter; (4) the evidence was legally insufficient to support the convictions; (5) the verdicts were against the weight of the evidence; and (6) the sentence was unduly harsh and excessive.   See

Petitioner's Appellate Brief ("Pet'r App. Br."), Resp't Ex. B.[5]  The prosecution filed an opposition brief, and Petitioner filed a reply.  *See* Resp't Ex. B.

The Appellate Division, Fourth Department, of New York State Supreme Court ("Appellate Division") unanimously affirmed the judgment of conviction on December 23, 2020.  *People v. Gant*, 189 A.D.3d 2160 (4th Dep't 2020).  Gant sought leave to appeal as to all issues raised in his opening appellate brief.  *See* Resp't Ex. C.  The New York Court of Appeals denied leave to appeal on March 15, 2021.  *People v. Gant*, 36 N.Y.3d 1097 (2021).

### B.    *Coram Nobis* Motion

On July 22, 2021, Gant filed a *pro se* motion for a writ of error *coram nobis*, arguing that appellate counsel erroneously failed to raise multiple issues on appeal.  *See* Resp't Ex. D.  The Appellate Division summarily denied the motion on October 1, 2021.  There is no indication that Petitioner sought leave to appeal to the New York Court of Appeals.

### C.    Motion to Set Aside the Sentence

On July 19, 2022, Gant filed a *pro se* motion to set aside the sentence under C.P.L. § 440.20(1) ("440.20 Motion").  *See* Resp't Ex. E.  Gant contended that each of the crimes was committed through the same act and therefore the sentences for each conviction were required to run concurrently with each other under P.L. § 70.25(2).  That is, the sentences on count nine (second-degree criminal possession of a weapon) and on counts two, three, and four (attempted second-degree murder) should have been set to run concurrently with, rather than consecutively to, the sentence on count one (second-

---

[5]    The briefs and orders filed in connection with Gant's various post-judgment applications for relief are in a separately bound appendix of exhibits manually filed by Respondent in connection with his answer to the petition.

degree murder).  This would have resulted in an aggregate sentence of 25 years to life versus the 35 years to life he actually received.  According to Gant, the *actus reus* of the murder overlapped with the *actus reus* of the attempted murders such that they were not discrete acts for which consecutive sentences legally could be imposed under P.L. § 70.25(2) (providing that concurrent sentences must be imposed "for two or more offenses committed through a single act or omission, or through an act or omission which in itself constituted one of the offenses and also was a material element of the other").

On May 10, 2023, the Erie County Court Suzanne Maxwell Barnes ("440.20 court") denied the motion without a hearing.  The 440.20 court found where, as here, separate offenses are committed through separate acts but are part of a single transaction, judges in New York State have the discretion to impose consecutive sentences.  Order Denying 440.20 Motion at 4, Resp't Ex. E.  There is no indication that Gant sought leave to appeal.

## IV.  Federal Habeas Proceeding

Gant filed his *pro se* petition on November 22, 2021.  ECF No. 1 at 16.  The petition asserts four grounds for relief: (1) the trial court erroneously instructed the jury as to *mens rea*, *id.* at 6; (2) the identification procedure was unduly suggestive, *id.* at 8; (3) the evidence was legally insufficient to support the verdicts, *id.* at 9; and (4) the sentence was excessive, *id.* at 11.

Respondent filed a response, ECF No. 13, and memorandum of law in opposition, ECF No. 14.  Respondent also filed the state court records and transcripts manually. Gant sought and obtained an extension of time to file a reply.  ECF Nos. 15, 16.  However, Gant never filed a reply or sought additional time in which to do so.

On September 16, 2024, the Court issued a text order directing Respondent to supply copies of various exhibits from the pre-trial suppression hearing and the trial. ECF No. 17. Respondent manually filed the requested exhibits on September 26, 2024.

## DISCUSSION

### I.    Limitations on Habeas Relief

As amended by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), 28 U.S.C. § 2254(d) "bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011) ("*Richter*"). Under 28 U.S.C. § 2254(d), a federal court "shall not . . . grant[ ]" an application for a writ of habeas corpus "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d). In addition, a state court's factual findings are entitled to a presumption of correctness which only may be rebutted by "clear and convincing evidence." *Id.* § 2254(e)(1).

The Supreme Court has explained that Section 2254(d) "sets forth a precondition to the grant of habeas relief . . . not an entitlement to it." *Fry v. Pliler*, 551 U.S. 112, 119 (2007). Thus, in addition to satisfying the limitations in § 2254(d), the petitioner still "bears the ultimate burden of proving by a preponderance of the evidence that his constitutional rights have been violated." *Epps v. Poole*, 687 F.3d 46, 50 (2d Cir. 2012).

II.     **Analysis of the Petition**

A.     **Erroneous Jury Charge (Ground One)**

1.     **Overview**

Gant asserts the trial court erroneously instructed the jurors that they could only find guilt on a single *mens rea.* ECF No. 1 at 6, 23, 29-33. This ground for relief corresponds to the second portion of the first argument raised in appellate counsel's opening brief on direct appeal. *See* Petitioner's Appellate Brief ("Pet'r App. Br.") at 7-11, Resp't Ex. B. Gant contended that the prosecution's viewpoint was based on a faulty reading of *Dubarry*, 25 N.Y.3d at 169, and the "inaccurate notion that the shooter could only have had a single *mens rea* throughout the incident." Pet'r App. Br. at 8.

According to Gant, the prosecution erroneously maintained that if the jury found him guilty of intentional murder as to Raymond (Count 1), it could not also consider the second-degree assault counts as to Dae'Mone, Austin, and Ned (Counts 6, 7, and 8) because they involved a reckless *mens rea*. *Id.* Instead, the jury only could consider whether Gant was guilty of Counts 2, 3, and 4 charging attempted second-degree (intentional) murder of Dae'Mone, Austin, and Ned. *Id.* Gant asserted that the trial court's instruction impermissibly took the issue of *mens rea* out of the jury's purview, *id.* at 8, and denied him the "opportunity to have the jury consider a lesser crime instead of attempted murder to account for the boys' injuries," *id.* at 11.

Gant argued that under *People v. Trappier*, 87 N.Y.2d 55 (1995), there were two outcomes related to different victims—"death to the decedent and injury to the three boys"—which "permit[ed] separate *mentes reae*." Pet'r App. Br. at 10. Thus, Gant contended, the jury could have found that his *mens rea* when he "aimed and shot the

decedent three times[] was intentional" while "the remaining seven shots were fired recklessly into the crowd, injuring the three boys." *Id.* In Gant's view, the proper route would have been to instruct the jury that after determining whether he was guilty of intentional *or* depraved indifference murder as to Raymond under Counts 1 or 5, and whether his actions were justified, the jury should decide whether he was guilty of injuring Dae'Mone, Austin, and Ned, either intentionally (Counts 2, 3, and 4) *or* recklessly (Counts 6, 7, and 8). *Id.* at 10-11.

In opposition, the prosecution did not explicitly take a position as to whether the trial assistant's *Dubarry* argument below was incorrect or whether the trial court's charge was erroneous. However, the prosecution conceded that under *Trappier*, Gant could "possess both an intentional and a reckless mental state with respect to different outcomes." People's Appellate Brief ("Peo. App. Br.") at 5, Resp't Ex. B.

The Appellate Division held that Gant had "waived" his challenge to the jury instructions concerning *mens rea* "by expressly consenting to the subject charge." *Gant*, 189 A.D.3d at 2161. The Appellate Division did not rule in the alternative as to the claim's merits.

### 2.    Respondent's Exhaustion Argument Misapprehends the Two Components of the Exhaustion Requirement

Respondent contends that Petitioner's claim "should be considered exhausted and procedurally barred because he did not raise the current challenge before the trial court, but instead waived any challenge, and there is no state court procedure left by which to raise the claim." ECF No. 13 at 2 ¶ 4 (citing *Teague v. Lane*, 489 U.S. 288, 297-98 (1989).

In *Teague*, the petitioner "admit[ted] that he did not raise [a particular] claim at trial *or* on direct appeal," 489 U.S. at 297 (emphasis supplied), and the Supreme Court found

that "[b]ecause of this failure, petitioner has forfeited review of the claim in the Illinois state courts," *id.* The Supreme Court further determined that since the petitioner faced a mandatory procedural bar imposed by Illinois state law if he tried to present the claim again to the state courts, he faced an absence of corrective process. In effect, the Supreme Court deemed the claim exhausted but found that the circumstances that led to its constructive exhaustion also created a procedural bar to habeas review.

The passage in *Teague* relied upon by Respondent dealt with the petitioner's failure to exhaust his remedies by completing one full round of the state's established appellate review process for constitutional claims. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (holding that the exhaustion doctrine requires "state prisoners . . . [to] give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process"). Inasmuch as Gant consented to the charge given, he did not present the claim to the trial court. However, unlike the petitioner in *Teague*; Gant *did* raise the claim on direct appeal. Thus, *Teague* is factually dissimilar to the instant case, and it is unclear why Respondent cited it.

Notably, Respondent has not argued that Gant failed to fulfill the other aspect of the exhaustion requirement—that the petitioner "fairly present" the claim by alerting the state court to "the federal constitutional nature of a claim." *Reid v. Senkowski*, 961 F.2d 374, 376 (2d Cir. 1992) (per curiam). In *Reid*, the Second Circuit found that the petitioner had exhausted a federal constitutional claim based on the failure to give a missing witness instruction where the petitioner's *pro se* supplemental appellate brief "framed the first question on appeal as '[w]hether appellant's right to due process of law was violated by

the trial court's refusal' to provide a missing witness jury charge," and, in the point heading, cited to the Fourteenth Amendment of the United States Constitution. *Id.* (alteration in original). The Second Circuit observed that while "it would be better practice for counsel when relying on a broad constitutional doctrine like the Fourteenth Amendment to support the claim with a factual premise and by citation to federal cases," *id.* (quoting *Gonzalez v. Sullivan*, 934 F.2d 419, 423 (2d Cir. 1991)), "a minimal reference to the Fourteenth Amendment satisfies the exhaustion requirement." *Id.* (collecting Second Circuit cases).

Although Gant's opening appellate brief cited only New York State cases, it did assert that the trial court's charging of all the intentional counts and all the reckless counts in the alternative operated to deny Gant his right to due process. Pet'r App. Br. at 8 ("The effect of the trial court's erroneous charge was to deny appellant due process."); *id.* at 11 (stating that the charge given "constituted a serious due process infraction"), Resp't Ex. B. Under *Reid*, it appears that Gant fairly presented his claim in constitutional terms.

But even if Gant did not satisfy the "fair presentation" component of the exhaustion requirement as to this claim, the claim should be denied as meritless, even under a *de novo* standard of review. Thus, "any failure to exhaust state court remedies would not bar denial of the petition on the merits." *Till v. Miller*, No. 96 CIV. 4387 (JGK), 1998 WL 397848, at *3 (S.D.N.Y. July 16, 1998) (citing 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.")).

### 3.    Respondent Waived the Affirmative Defense of Procedural Default

The Court notes that the Appellate Division's rejection of the jury charge claim as waived suggests it relied on an adequate and independent state ground, which generally bars habeas review unless the petitioner can overcome the procedural default. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  That said, "procedural default is normally a 'defense' that the State is 'obligated to raise' and 'preserv[e]' if it is not to 'lose the right to assert the defense thereafter.'"  *Trest v. Cain*, 522 U.S. 87, 89 (1997) (quoting *Gray v. Netherland*, 518 U.S. 152, 166 (1996)).

To preserve a trial-level error for appellate review in New York State, a defendant must lodge a timely objection as required by C.P.L. § 470.05(2), the so-called contemporaneous objection rule.  Here, since trial counsel expressly consented to the jury charge, he obviously did not then object to its propriety.  Although the Appellate Division phrased its rejection of the jury charge claim in terms of waiver rather than lack of preservation, its rationale could only have been that trial counsel failed to comply with C.P.L. § 470.05(2).

The Second Circuit has observed and deferred to New York State courts' reliance on the contemporaneous objection rule as an adequate and independent state ground that bars habeas review.  *Whitley v. Ercole*, 642 F.3d 278, 286-87 (2d Cir. 2011) (collecting cases).  However, Respondent has not argued that the Appellate Division relied on an adequate and independent state ground to reject the jury charge claim.  "Consequently, Respondent has waived the affirmative defense of procedural default, and there is no impediment to this Court reviewing the unpreserved claim."  *Williams v.*

*McCarthy*, 708 F. Supp. 3d 309, 335 (W.D.N.Y. 2023) (citing *Sutton v. Graham*, No. 11-CV-06532 MAT, 2012 WL 4103884, at *7 (W.D.N.Y. Sept. 17, 2012) (collecting cases)).

### 4. The Jury Charge Claim Was Not "Adjudicated on the Merits"

The Court next considers whether there is an adjudication on the merits to which deference under 28 U.S.C. § 2254(d) must be accorded. As noted above, the Appellate Division rejected the claim as "waived" due to trial counsel's consent to the jury charge issued by the trial court. Since the Appellate Division provided no alternative holding as to the claim's merits, deference under 28 U.S.C. § 2254(d) is not applicable. *See*, *e.g.*, *Fong v. Poole*, 522 F. Supp. 2d 642, 657-58 (S.D.N.Y. 2007) (finding that state appellate court did not rule alternatively on merits of petitioner's claim that deadlock charge was unconstitutionally coercive where court stated that petitioner "failed to preserve his argument that the court's deadlock charge was coercive," and that "were [it] to review" deadlock charge claim, "[it] would find that under these circumstances the charge was not coercive," but it then "decline[d]" to review deadlock charge claim itself "in the interest of justice"; therefore, deference under 28 U.S.C. § 2254(d) was not required).

### 5. The Jury Charge, Even if Erroneous Under State Law, Did Not Violate Due Process

"In order to obtain a writ of habeas corpus in federal court on the ground of error in a state court's instructions to the jury on matters of state law, the petitioner must show not only that the instruction misstated state law but also that the error violated a right guaranteed to him by federal law." *Blazic v. Henderson*, 900 F.2d 534, 540 (2d Cir. 1990) (quoting *Casillas v. Scully*, 769 F.2d 60, 63 (2d Cir. 1985)). The question is not whether the trial court gave an "undesirable, erroneous, or even universally condemned [instruction]." *Cupp v. Naughten*, 414 U.S. 141, 146 (1973) (internal quotation marks

omitted). Instead, "[t]he question is '"whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process."'" *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (per curiam) (quoting *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Cupp*, 414 U.S. at 147))).

For Gant to succeed on this claim, the Court must find that (1) New York State law prohibited the trial court from charging all the offenses involving a reckless mental state (Counts 5 through 8) in the alternative to all the offenses involving an intentional mental state (Counts 1 through 4), even though the charges pertained to different victims; and that (2) the charge violated a right guaranteed by the Fourteenth Amendment's Due Process Clause.

As noted above, the prosecution requested that the offenses involving different mental states be charged in the alternative based on their reading of a then-recent Court of Appeals case, *Dubarry*, 25 N.Y.3d 161, *supra*. In *Dubarry*, the defendant killed one victim in the course of attempting to kill someone else. *Id.* at 165. The trial judge instructed the jury in the conjunctive on depraved indifference murder and intentional murder on a transferred intent theory. *Id.* at 168. "In other words, the court instructed the jury to consider depraved indifference murder and, irrespective of its verdict on that count, to then consider intentional murder." *Id.* The jury returned guilty verdicts on both depraved indifference murder and intentional murder on a transferred intent theory. *Id.* at 169.

The defendant in *Dubarry* claimed that "the trial court violated his due process rights when it submitted to the jury depraved indifference murder and intentional murder on a transferred intent theory in the conjunctive with respect to the *same* victim." *Id.*

(emphasis supplied).   The defendant further contended that "where the actual and intended victims are different, conviction on both murder counts unlawfully subject[ed] him to multiple criminal liability for a single homicide."  *Id.*

The State "respond[ed] that the convictions should be affirmed because each murder count requires its own particular culpable mental state and outcome."  *Id.* According to the State, the case fell within the ambit of *Trappier*, 87 N.Y.2d 55, which "affirmed the principle that the separate *mens rea* of intent and recklessness 'are not mutually exclusive when applied to *different outcomes*.'"  *Dubarry*, 25 N.Y.3d at 173 (emphasis supplied (quoting *Trappier*, 87 N.Y.2d at 57)).

The *Dubarry* court found the State's reliance on *Trappier* misplaced.  *Id.*  In fact, the State committed a "fundamental error" by failing to recognize that while there were "two distinct states of mind attendant to the murder counts, there [was] but *one outcome* in [Dubarry]'s case: the death of the victim."  *Id.* (emphasis supplied).  The State thus improperly "focus[ed] on the intended victim rather than on the outcome that a murder was committed."  *Id.*  In addition, by charging depraved indifference and intentional murder based on transferred intent in the conjunctive as to the same outcome (the homicide of the actual, unintended victim), the trial judge allowed the jury to avoid determining the defendant's *mens rea* for the conduct of which he was accused.  *Id.* at 172.

Gant has not established that the jury charge in his case resulted in the same type of errors that occurred in *Dubarry*.  First, he was not convicted and punished more than once for conduct that constituted only one prohibited act.  *Id.*  Second, the charge did not remove the issue of determining *mens rea* from the jury's purview, *id.* at 170.  While the

charge dictated the order in which the jury considered the charges, it did not allow the jury to impose guilt without determining whether Gant acted intentionally or recklessly. Thus, unlike the charge in *Dubarry*, the charge here did not "absolve[] the jury of rendering a verdict based on a proper determination of the defendant's state of mind." *Id.* at 172. Gant thus has not shown that the trial court's charge ran afoul of *Dubarry*.

Significantly, the New York Court of Appeals reached its holding in *Dubarry* "based on [its] reading of the Criminal Procedure Law and the Penal Law, [its] case law, and the stated purpose of the transferred intent theory." 25 N.Y.3d at 170. *Dubarry* specifically avoided deciding the due process issue asserted by the defendant in that case. *See id.* at 169. Thus, even if the trial court's charge reflected some misstatement or misunderstanding of New York State law, Gant has not demonstrated that it amounted to a due process violation. In short, *Dubarry* does not support Gant's argument that a constitutional error occurred at his trial.

Moreover, Gant has not attempted to show that the challenged instruction made any difference to the verdict. While Gant maintained that the trial court's charge "prevent[ed] the jury from reaching the three counts of reckless conduct," Pet'r Reply at 5, Resp't Ex. B, Gant has conceded that it "is not possible to know what the result of the jury's deliberation would have been had it been properly instructed." Pet'r App. Br. at 11, Resp't Ex. B. As the prosecution observed, since the jury found Gant guilty beyond a reasonable doubt as to all three counts of attempted second-degree murder, "it [was] pure speculation to suggest that, had the jury reached the reckless assault counts, they would have abandoned their previous finding." Peo. App. Br. at 5, Resp't Ex. B. In his reply, Gant admitted that the prosecution was "correct" and argued that reversal was warranted

*because* it was unknown what the jury would have concluded if instructed differently.  Pet'r Reply at 5, Resp't Ex. B.  Gant's concession regarding the lack of demonstrable prejudice defeats his due process claim.  *See*, *e.g.*, *Blazic*, 900 F.2d at 543 (concluding that petitioner was entitled under New York law to a justification charge on the facts of his case, but because it "perceive[d] no basis to conclude that a jury would have responded differently had the charge been given[,]" it rejected petitioner's contention that the trial court's omission of a justification charge "'so infected the entire trial that the resulting conviction violate[d] due process'").  For the foregoing reasons, habeas relief is unwarranted on the jury charge claim in Ground One.

### B.   Unduly Suggestive Identification (Ground Two)

#### 1.   Overview

This ground for relief corresponds to Point II of Gant's appellate brief.  Pet'r App. Br. at 12-16, Resp't Ex. B.  Gant argued that Witness A's identification testimony was the product of an unduly suggestive police-arranged procedure because, on the day prior to the photographic array, the police had Witness A view a cell phone video, recorded by another bystander, depicting part of the "girl fight" that preceded the shooting.  In his reply, Gant clarified that he was not complaining about the composition of the photographic array itself, *see* Pet'r Reply at 6-7.  Instead, Gant argued that the cell phone video was "highly suggestive" because Gant allegedly was the "prominent image," Pet'r App. Br. at 12, and "the featured male," Pet'r Reply at 6, in the video.  According to Gant, Witness A's viewing of the cell phone video tainted her subsequent identification of Gant in the photo array.

The Appellate Division referred to this claim only as Gant's "remaining contention" and stated that it "does not warrant modification or reversal of the judgment." *Gant*, 189 A.D.3d at 2161. The Appellate Division's ruling, though unexplained, constitutes an adjudication on the merits for purposes of 28 U.S.C. § 2254(d). *See Cullen v. Pinholster*, 563 U.S. 170, 187 (2011) ("Section 2254(d) applies even where there has been a summary denial.").

When reviewing a state court decision that was adjudicated on the merits but without any express reasoning, a federal habeas court must "'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale and then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 584 U.S. 122, 122 (2018). Here, the trial court's decision denying the suppression motion provided a rationale for rejecting Gant's suggestive identification claim. In relevant part, the trial court found that:

> the identification of the defendant, both from the video and from the photo array, was not suggestive. When the video was shown to the potential witness, [Witness A,] the police were clearly still investigating the shooting and attempting to see if anyone could be singled out as the shooter. It was only after the defendant was pointed out to them from the video, that police, using an abundance of caution, presented a photo array to the witness. Proper instructions were given before the array was displayed to the witness. The array itself—a compilation of six very similar looking males— is not in any way suggestive. Nor was there any evidence that the witness was directed to select the defendant from the array.

June 10, 2015 Order at 5, Resp't Ex. A. Accordingly, the Court will "look through" the Appellate Division's order to the trial court's order denying the suppression motion.

### 2. Gant Has Not Satisfied Section 2254(d)

The Supreme Court "has said that 'due process concerns arise only when law enforcement officers use[d] an identification procedure that is *both* suggestive and

unnecessary.'"  *Sexton v. Beaudreaux*, 585 U.S. 961, 965 (2018) (alteration and emphasis in original (quoting *Perry v. New Hampshire*, 565 U.S. 228, 238 (2012))).  "To be 'impermissibly suggestive,' the procedure must 'give rise to a very substantial likelihood of irreparable misidentification.'"  *Id.* at 965-66 (quoting *Neil v. Biggers*, 409 U.S. 188, 197 (1972) (some internal quotation marks omitted)).  But "[e]ven when the police use such a procedure, . . . suppression of the resulting identification is not the inevitable consequence," *Perry*, 565 U.S. at 239, provided that the "totality of the circumstances" show that other indicia of reliability "outweigh[ ] . . . the corrupting effect of law enforcement suggestion."  *Id.* at 240.

Examples of suggestive procedures that raise due process concerns include lineups in which "all [subjects] . . . but the suspect were known to the identifying witness," "the other participants in a lineup were grossly dissimilar in appearance to the suspect," "only the suspect was required to wear distinctive clothing which the culprit allegedly wore," "the witness is told by the police that they have caught the culprit after which the defendant is brought before the witness alone or is viewed in jail," "the suspect is pointed out before or during a lineup," and "the participants in the lineup are asked to try on an article of clothing which fits only the suspect."  *United States v. Wade*, 388 U.S. 218, 233 (1967); *accord Perry*, 565 U.S. at 243.

The showing of the cell phone video to Witness A involved none of the improperly suggestive factors described above in *Wade*, 388 U.S. at 233.  Indeed, as the trial court found, the police had not identified any potential suspects at the time they showed the cell phone video to Witness A.  Therefore, this was not a situation where the "[p]ersons who conduct[ed] the identification procedure [could] suggest, intentionally or

unintentionally, that they expect the witness to identify the accused." *Moore v. Illinois*, 434 U.S. 220, 224 (1977). Only after Witness A pointed out Gant in the video and confirmed her recognition of him based on a still photo extracted from the video did the police prepare a photographic array that included Gant as one of the suspects.

Gant also contends that the video itself inadvertently signaled, "that's the man," *Wade*, 388 U.S. at 236, because it showed his image most "prominent[ly]," Pet'r App. Br. at 12, and "featured" him, Pet'r Reply at 6. Although the trial court did not make a specific factual finding on this issue, this Court has reviewed the DVD-R of the video finds that Gant's assertions are unsubstantiated. The video depicts multiple different black male bystanders who are watching the fight. To the extent that anyone is "featured" on the video, it is the two girls who were fighting.

Although Gant focused his argument on Witness A's viewing of the cell phone video prior to photographic array, the Court has, in the interest of completeness, evaluated the propriety of the photographic array itself (People's Hearing Exhibit 1) and concludes it was not unduly suggestive. To decide whether a photographic array is unduly suggestive, a court should consider "the size of the array, the manner of presentation by the officers, and the array's contents," *United States v. Maldonado-Rivera*, 922 F.2d 934, 974 (2d Cir. 1990), to determine "whether the picture of the accused . . . so stood out from all of the other photographs as to suggest to an identifying witness that [the accused] was more likely to be the culprit." *Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir. 1986) (citations and quotations omitted).

Gant's photograph was one of six color, close-up head shots of different, similarly-aged black men, all of whom had very closely cropped haircuts and very light facial hair.

Thus, as the trial court found, the filler photographs were all similar-looking to Gant. Wrest, the BPD officer who showed the photographic array to Witness A, credibly testified at the suppression hearing that she performed a double-blind photo array, meaning that she did not know any specific information about the underlying investigation, including who the suspect was or where the suspect was placed in the photo array. The instructions that Wrest read verbatim to Witness A included the advisements that "[t]he person who committed the crime may or may not be included in the photos [Witness A would] be viewing," and that "[p]ersons shown in the photos may not appear exactly as they did on the date of the incident because features, such as head and facial hair, are subject to change." People's Hearing Exhibit 1. Thus, the manner in which Wrest presented the array to Witness A did not suggest which, if any, photograph to select.

The state court did not unreasonably apply, or rule in a manner contrary to, clearly established Supreme Court precedent when it rejected Gant's claim that the identification procedures were unduly suggestive. Therefore, it is unnecessary to consider whether Witness A had an independent basis on which to make an identification. *See Perry*, 565 U.S. at 248 ("[T]he Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement."). Habeas relief will not issue on the suggestive identification procedure claim in Ground Two.

### C.    Legal Insufficiency of the Evidence (Ground Three)

#### 1.    Overview

At the close of the prosecution's case, trial counsel moved for a trial order of dismissal as to all counts. T.1416-21. Trial counsel focused mainly on the murder,

attempted murder, and reckless assault counts, arguing that the prosecution failed to disprove Gant's justification defenses beyond a reasonable doubt.  T.1417-20.  The trial court summarily denied the motion.  T.1421.

On direct appeal, appellate counsel argued that in light of the various witnesses' testimony that Gant was jumped by multiple men, the prosecution failed to prove that Gant "lacked a subjective belief that the use of deadly force was necessary."  Pet'r App. Br. at 18, Resp't Ex. B.  The Appellate Division held that "the evidence is legally sufficient to support the conviction of murder in the second degree and attempted murder in the second degree, and the verdict on those crimes is not against the weight of the evidence when viewed in light of the elements of the crimes and the justification instruction as given to the jury."  *Gant*, 189 A.D.3d at 2161.  "Indeed," the Appellate Division said, "the trial evidence overwhelmingly disproved defendant's justification defense."  *Id.*  Therefore, the Appellate Division concluded, "an acquittal on justification grounds would have been unreasonable on this record."  *Id.*  The Appellate Division's holding constitutes an adjudication on the merits for purposes of 28 U.S.C. § 2254(d).

### 2. Gant Has Not Satisfied Section 2254(d)

The Due Process Clause of the Fourteenth Amendment prohibits a criminal conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime."  *In re Winship*, 397 U.S. 358, 364 (1970).  As the Supreme Court has interpreted *Winship*, evidence is legally sufficient to satisfy due process if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

Because the Appellate Division adjudicated the legal sufficiency claim on the merits for purposes of 28 U.S.C. § 2254(d), this Court, sitting in habeas review, must apply a layer of deference in addition to that imposed by *Jackson* itself. *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) ("*Johnson*"). Mere disagreement with the Appellate Division's decision is not sufficient to justify habeas relief. *Id.* (citing *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam)). Instead, the Court must find that the Appellate Division's decision reflects an "objectively unreasonable," 28 U.S.C. § 2254(d)(1), application of *Jackson*. *See Cavazos*, 565 U.S. at 2.

Generally, a legal sufficiency analysis begins with identifying the substantive elements of the underlying crime. *See Jackson*, 443 U.S. at 324 n.16. Here, Gant has not disputed any of the elements of the underlying crimes; instead, he argues that the prosecution did not disprove his justification defense beyond a reasonable doubt. "Justification in New York is a defense, not an affirmative defense; 'therefore, when the defense is raised on a proper evidentiary record, the People bear the burden of disproving it beyond a reasonable doubt.'" *Jackson v. Edwards*, 404 F.3d 612, 622 (2d Cir. 2005) (quoting *Davis v. Strack*, 270 F.3d 111, 124 (2d Cir. 2001)); *see also People v. McManus*, 67 N.Y.2d 541, 546-47 (1986) (stating that "whenever justification is sufficiently interposed by the defendant, the People must prove its absence to the same degree as any element of the crime charged").

As the Second Circuit has observed, the New York Court of Appeals has construed the justification defense as entailing a subjective and an objective component. *Jackson*, 404 F.3d at 623. "The fact-finder must determine that the defendant believed deadly physical force was necessary and that a reasonable person would have believed the use

of deadly physical force was necessary under the same circumstances." *Id.* In addition, "[i]f a defendant who is confronted with deadly physical force knows he can retreat with complete safety but fails to do so, the justification defense is lost." *Id.*; *see also People v. Russell*, 91 N.Y.2d 280, 290 (1998) ("[A] person who reasonably believes that another is about to use deadly physical force is not free to reciprocate with 'deadly physical force if he knows that he can with complete safety as to himself and others avoid the necessity of so doing by retreating.'" (quoting N.Y. Penal Law § 35.15(2)(a)).

Gant argues that the prosecution failed to establish that he "lacked a subjective belief that the use of deadly force was necessary" because "the video does not establish that [he] fired after the threat had dissipated." Pet'r App. Br. at 18, Resp't Ex. B. Gant asserts that the "position of the men when [he] fired is not discernible from the [cell phone] video [of the fight between the girls] and the witnesses did not specifically address the issue." *Id.* Gant's latter assertion is clearly contradicted by the trial testimony of several of the prosecution's witnesses, who provided relevant testimony from which a rational jury could conclude that at the time Gant fired the gun, he did not face the use or imminent use of deadly physical force. For instance, Smith, Clark, and Rozier-Sharpe testified that Gant was involved in a fist-fight and that they saw no one else besides Gant with a gun or other deadly weapon. T.898-901, 978-81, 1336-40. Even Kearney, Gant's girlfriend, testified that she did not see anyone with a gun. T.812. Furthermore, Smith, Clark, and Rozier-Sharpe provided relevant testimony from which a rational jury could conclude that Gant knew he could have retreated with complete safety as to himself and others, but he did not do so. T.898-901, 978-81, 1336-40.

As is often the case, "the jury's decision was largely a matter of choosing whether to believe [Gant's] version of the events or to believe the version offered by the State." *Gruttola v. Hammock*, 639 F.2d 922, 928 (2d Cir. 1981). Here, the jury chose to believe the prosecution's witnesses and resolved any inconsistencies in their testimony against the defense. "[T]he only question under *Jackson* is whether th[e] [jury's] finding was so insupportable as to fall below the threshold of bare rationality." *Johnson*, 566 U.S. at 656. The Appellate Division answered this question in the negative, "and that determination in turn is entitled to considerable deference under AEDPA, 28 U.S.C. § 2254(d)." *Id.* Gant has not shown that the Appellate Division's rejection of his legal insufficiency claim reflects an erroneous application of federal law, much less that it "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *Richter*, 562 U.S. at 103. Habeas relief therefore is unwarranted on the legal insufficiency claim in Ground Three.

### D.    Excessive Sentence (Ground Four)

#### 1.    Overview

In the petition under Ground Four, Gant asserts that his sentence was "excessive." ECF No. 1 at 11. Respondent has answered the petition as if Gant raised the excessive sentencing claim raised on direct appeal. ECF No. 14 at 18. In Point IV of his appellate brief, Gant asked the Appellate Division to invoke its statutory authority to modify his sentence in the interest of justice. The Appellate Division held that the sentence was "not unduly harsh or severe." *Gant*, 189 A.D.3d at 2161. However, the petition does not reference the facts underlying that sentencing claim. Instead, it appears that Petitioner is raising the same consecutive sentencing claim as presented in his 440.20 motion.

Compare ECF No. 1 at 11 *with id.* at 42-44.  As noted above, the 440.20 court found this claim to be meritless as a matter of New York State law.

### 2.    The Sentencing Claims Are Not Cognizable

It is well settled that federal habeas corpus relief does not lie for mere errors of state law.  *Estelle v. McGuire*, 502 U.S. 62, 68 (1991); 28 U.S.C. § 2254(a).  Courts in this Circuit uniformly have held that "whether sentences should be made to run concurrently or consecutively is purely a question of state law and is not cognizable on a habeas petition."  *Reyes v. New York*, No. 08 Civ. 8645, 2009 WL 1066938, at *2 (S.D.N.Y. Apr. 21, 2009) (citing *United States v. McLean*, 287 F.3d 127, 136-37 (2d Cir. 2002) ("[T]here is 'no constitutionally cognizable right to concurrent, rather than consecutive, sentences.'" (quoting *United States v. White*, 240 F.3d 127, 135 (2d Cir. 2001)); *see also Johnson v. New York*, 851 F. Supp. 2d 713, 722 (S.D.N.Y. 2012) ("Whether a sentence should run concurrently or consecutively is purely an issue of state law and is not cognizable on federal habeas review."); *Lopez v. Goord*, No. 05 Civ. 5855, 2008 WL 3158447, at *4 (S.D.N.Y. Aug. 5, 2008) ("[I]t is purely a matter of state law how a prison term should be served, whether concurrent or consecutive." (citing *Davis v. Herbert*, No. 02 Civ. 4908, 2003 WL 23185747, at *15 (E.D.N.Y. Oct. 24, 2003)).  Because the consecutive sentencing claim raised in the 440.20 motion does not present a federal constitutional issue amenable to review in a § 2254 proceeding, it is dismissed as not cognizable.

To the extent that Gant is reasserting the sentencing claim raised on direct appeal—the trial court abused its discretion and imposed an unduly harsh and severe sentence—it likewise must be denied as not cognizable.  *See Fielding v. LeFevre*, 548

F.2d 1102, 1109 (2d Cir. 1977) (holding that petitioner raised no cognizable federal claim by seeking to prove that state judge abused his sentencing discretion by disregarding psychiatric reports (citing *Townsend v. Burke*, 334 U.S. 736, 741 (1948) ("The [petitioner's] sentence being within the limits set by the statute, its severity would not be grounds for relief here even on direct review of the conviction, much less on review of the state court's denial of habeas corpus.")). "A challenge to the term of a sentence is not a cognizable constitutional issue if the sentence falls within the statutory range." *Jones v. Artus*, 615 F. Supp. 2d 77, 87 (W.D.N.Y. 2009) (citing *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992)).

Gant does not allege that any of his individual sentences exceeded the statutory maximum. As discussed above, his challenge to the manner in which the sentences were set to run is not cognizable and is, as the 440.20 court previously found, meritless. The sentencing claim raised on direct appeal likewise does not present a federal constitutional issue and is dismissed as not cognizable in this habeas proceeding.

## CONCLUSION

For the reasons above, the request for a writ of habeas corpus is denied, and the petition, ECF No. 1, is dismissed. Because Gant has not made a substantial showing of the denial of a constitutional right, the Court declines to issue a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1), (2). The Clerk is directed to close this action.

SO ORDERED.

CHARLES J. SIRAGUSA
District Judge
United States District Court

Dated:        November 8, 2024
              Rochester, New York

- 42 -